**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TRAVIS MALOTT, | |
| Plaintiff, | No. 13 C 5714 |
| v. | Magistrate Judge Mary M. Rowland |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Travis Malott filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the Commissioner's decision is remanded for further proceedings consistent with this opinion.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 25(d)(1).

# I. SEQUENTIAL EVALUATION PROCESS

To recover SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of

---

[2] The regulations governing the determination of disability for SSI are found at 20 C.F.R. § 416.901 et seq. The standard for determining SSI DIB is virtually identical to that used for Disability Insurance Benefits (DIB). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI on June 24, 2010, alleging that he became disabled on May 1, 2008, due to behavioral and emotional problems, attention deficit hyperactivity disorder (ADHD), bipolar disorder, anxiety, depression, paranoia, schizophrenia and a learning disability. (R. at 11, 73, 129). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 11, 66–79, 81). On February 8, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 11, 25–65). The ALJ also heard testimony from James J. Radke, a vocational expert (VE). (*Id.* at 25, 55–65, 118).

The ALJ denied Plaintiff's request for benefits on April 16, 2012. (R. at 11–19). Applying the five-step sequential evaluation, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since June 24, 2010, the application date. (*Id.* at 13). At step two, the ALJ found that Plaintiff's learning disorder, anti-social personality disorder, ADHD, bipolar disorder, and substance abuse, in remission, are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 13–15).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that he has the RFC to perform a full range of work at all exertional levels, subject to the following nonexertional limitations: the work must be "the simplest work in the United States economy, no higher than GED 1–2. The work must be routine, stay the same day-to-day and involve no frequent interaction, no team coordination and no public contact. [Plaintiff] must work alone." (R. at 15). At step four, the ALJ determined that Plaintiff has no past relevant work. (*Id.* at 18). At step five, based on Plaintiff's RFC, age, education, work experience, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including vehicle cleaner, vegetable harvester and bagger. (*Id.* at 18–19). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 19).

The Appeals Council denied Plaintiff's request for review on June 13, 2013. (R. at 1–6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regula-

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

tions. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. MEDICAL AND EDUCATIONAL EVIDENCE

## A. Educational Records

Plaintiff graduated from high school in 2008, after spending most of his schooling in special education due to emotional, behavioral and academic problems. (R. at 315, 30, 153–309). He was first found eligible for special education after kindergarten (*id.* at 170), and continued to be eligible in middle school (*id.* at 175). At that time, Plaintiff's verbal, performance and full-scale intelligence scores were in the borderline range. (*Id.* at 173). He was taking prescription Adderall.[4] (*Id.* at 173).

In 2005, Plaintiff, as a result of emotional disturbance, was one of twelve students in a highly structured special education class in an alternative high school. (R. at 211, 208). He had anger management issues, poor social interactions, problems with authority, a learning disability, speech and language issues, and a hearing impediment. (*Id.*). Plaintiff was diagnosed with ADHD, and had taken Adderall (inconsistently) and Strattera[5] at different times in the past, each causing some side effects. (*Id.* at 210). He attended weekly therapy at school. (*Id.*).

Plaintiff's 9th grade teacher, Sarah Lingle, completed a questionnaire requested by the DDS. (R. at 155–63). She stated that Plaintiff had problems functioning in the following categories: acquiring and using information, attending and completing

---

[4] Adderall (amphetamine and dextroamphetamine) is used to treat ADHD by increasing attention and decreasing restlessness. <www.mayoclinic.org/drugs-supplements> A later evaluation dated March 22, 2005, indicates that Plaintiff was diagnosed with ADHD in 3rd grade. (R. at 219). Plaintiff was prescribed medication for his Attention Deficit Disorder ADD/ADHD as early as 1996. (*Id.* at 403, 410–15).

[5] Strattera (Atomoxetine) is used to treat ADHD by increasing attention and decreasing restlessness. <http://www.mayoclinic.org/drugs-supplements>

tasks, interacting and relating with others, and caring for himself. (*Id.* at 157–61). His Individualized Education Program (IEP) reflected his continued need for a highly structured learning environment. (*Id.* at 200).

General intelligence and social/emotional tests administered in 2005 revealed that Plaintiff had significant weakness in word knowledge and verbal concepts, immature interrelationship skills, and difficulties with feelings. (R. at 211). Moreover, he was performing below grade level in basic subject areas. (*Id.* at 212–13). During a re-evaluation on March 24, 2005, Plaintiff's reading and written language levels were in the 1st percentile, and his math level was in the 3rd percentile. (*Id.* at 153).

When Plaintiff was 17 years old in 11th grade,[6] he had continued significant verbal processing deficits resulting in a learning disability. (R. at 223, 226). He also appeared to be more handicapped by social and emotional issues. (*Id.*). Len Schmelkin, a Licensed Clinical Social Worker (LCSW), indicated Plaintiff had attendance issues, had been sent to the Critical Incidence Behavior Stabilization Room 29 times the prior year, and had also required seven physical managements in the prior year. (*Id.* at 230).

---

[6] The report later indicates that, based on credits, Plaintiff was in 12th grade. (R. at 227, 228). Plaintiff, however, graduated in 2008.

## B. Dr. Latham's Evaluation

On June 19, 2009, Anthony Latham, Psy.D., performed a psychological evaluation as part of a pre-sentencing investigation.[7] (R. at 460). Plaintiff's intellectual functioning appeared well-below average, and the inventories had to be read aloud due to reading limitations. (*Id.* at 461). While Plaintiff's memory, attention, concentration and persistence were relatively unimpaired, he appeared to be highly impulsive. (*Id.*). Moreover, Plaintiff had poor judgment, had limited capacity for insight, and appeared to be a "self-serving" historian. (*Id.*). On the Shipley-2 test, which assesses intellectual functioning, Plaintiff scored in the 12th percentile for block patterns (classified as below average), the 1st percentile for composite (classified as extremely low), and below the 1st percentile for vocabulary (classified as extremely low). (*Id.*). On the State-Trait Anger Expression Inventory-2, Plaintiff reported frequent, intense anger. (*Id.* at 461–62). On the Millon Clinical Multiaxial Inventory-III (MCMI-III), which assess personality and emotional functioning, Plaintiff responded to questions in an honest and open manner. (*Id.* at 462). He reported symptoms associated with psychiatric distress, severe anxiety, and paranoia, and admitted experiencing schizoid personality features. (*Id.*).

Dr. Latham's report includes criminal history, in which Plaintiff reported his felony charge for selling his prescription Adderall, which he began doing at age 17. (R. at 462, 463). After being ordered to Gateway Residential for drug treatment as part

---

[7] The charge at issue was criminal damage to property. (R. at 460).

of juvenile probation, Plaintiff was able to get out "by throwing a fit." (*Id.* at 463). He then entered and completed treatment at another facility. (*Id.*).

In a 2006 evaluation, Plaintiff was diagnosed with oppositional defiant disorder (ODD),[8] intermittent explosive disorder,[9] ADHD, cannabis abuse, and borderline intellectual functioning. (R. at 466). Plaintiff continued to demonstrate significant impulsivity associated with ADD. (*Id.* at 467). Dr. Latham opined that Plaintiff's inability to cope well with his learning and speech limitations, his limited attention span and his high degree of impulsivity "fostered his propensity to engage in disruptive conduct." (*Id.*). Dr. Latham diagnosed Plaintiff with ADHD, conduct disorder, cannabis dependence, alcohol abuse, anxiety disorder, and reading disorder, and assessed a current Global Assessment of Functioning (GAF) score of 60.[10] (*Id.* at 468).

## C. Lake County Health Department Records

On February 8, 2010, Plaintiff reported he did not like the side effects of Adderall. (R. at 489). He further reported anxiety, depression, crying, anger problems,

---

[8] ODD usually develops before the early teen years, and is associated with negativity, defiance, disobedience, and hostility directed toward authority figures. ODD often occurs with other behavioral or mental health problems, including ADHD. <www.mayoclinic.org/diseases-conditions>

[9] "Intermittent explosive disorder involves repeated episodes of impulsive, aggressive, violent behavior or angry verbal outbursts in which [one] react[s] grossly out of proportion to the situation." <http://www.mayoclinic.org/diseases-conditions/intermittent-explosive-disorder/basics/definition/con-20024309>

[10] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." *Diagnostic and Statistical Manual of Mental Disorders* 28 (4th ed. Text Rev. 2000) (hereinafter DSM-IV) at 32. A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

and nightmares about being killed or killing. (*Id.*). Plaintiff's mood was dysphoric, thought content was hopeless, and he presented with flight of ideas. (*Id.* at 490).

On May 31, 2011, Plaintiff was admitted to the crisis care program at Lake County Health Department, presenting with symptoms of anxiety and depression. (R. at 609). He was not taking any medication, despite it being prescribed. (*Id.*). Plaintiff was socially isolated, had difficulty interacting with others and was currently on probation. (*Id.*). He was diagnosed with bipolar disorder, and his GAF score was assessed at 50.[11] (*Id.*). Because Plaintiff discharged himself against medical advice on the same day he was admitted, his mental status at discharge was described as unstable. (*Id.*).

## D. Treating Psychiatrist Dr. Fraum

Plaintiff first began seeing Beth Fraum, M.D., in March 2010. (R. at 485). On March 22, 2010, Dr. Fraum completed an initial psychiatric assessment, in which she diagnosed Plaintiff with bipolar disorder NOS, impulse control disorder NOS, alcohol dependence in remission, and marijuana dependence in remission (*id.* at 487), and assessed a GAF score of 48 (*id.* at 488). Plaintiff reported attention deficit problems, paranoia, anxiety, mood alterations, racing thoughts, and a history of doing things without regard to consequences, among other symptoms. (*Id.* at 485). He began using marijuana at age 14 and alcohol at age 15, but was clean and sober at the time of the report. (*Id.*). Plaintiff's risk factors for suicide included depressed

---

[11] A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

mood and impulsiveness. (*Id.* at 487). Dr. Fraum prescribed Lamictal 25 mg and Seroquel XR 50 mg.[12] (*Id.*). Upon mental status examination, Dr. Fraum found Plaintiff's responses and processing speed to be very slow. (*Id.*). She concluded that he had poor judgment and a history of impulse control and attention problems. (*Id.* at 488).

During his April 19, 2010 appointment, Plaintiff was calm, but his affect was blunted. (R. at 484). Dr. Fraum switched Plaintiff's Seroquel XR to Seroquel regular due to side effects of sedation, and she diagnosed him with bipolar disorder NOS**,** impulse control, alcohol dependence, and marijuana dependence. (*Id.*). On May 18, 2010, Dr. Fraum recorded in her notes that Plaintiff "drank x2 a little not drunk," had a fair mood, and had some racing thoughts. (*Id.* at 484). His affect was blunted. (*Id.*). On July 15, 2010, Dr. Fraum observed that Plaintiff was tired, but noted that he felt stable, calm and focused. (*Id.* at 483). She increased his Lamictal dosage. (*Id.*). On October 18, 2010, Plaintiff complained of depression. (*Id.* at 531). Dr. Fraum found that his mood was low and affect was restricted. (*Id.).*

On February 14, 2011, Dr. Fraum learned that Plaintiff stopped his medications for two months because of the side effects. (R. at 543). He was having suicidal idea-tions, which had since ended. (*Id.*). Dr. Fraum noted mood swings, depression, irri-

---

[12] Lamictal (Lamotrigine) is used to treat seizures, but can also be used to treat bipolar disorder. <http://www.mayoclinic.org/drugs-supplements> Seroquel XR (Quetiapine) "is used to treat nervous, emotional, and mental conditions (e.g., schizophrenia)," and may also be used to treat symptoms of bipolar disorder. <http://www.mayoclinic.org/drugs-supplements/quetiapine-oral-route/description/drg-20066912> A medication record indi-cates Plaintiff was taking Seroquell (XR or regular) and Lamictal from March 22, 2010, to October 18, 2010. (R. at 530).

tability, anxiety and panic, and resumed Plaintiff's antidepressant medication. (*Id.*).
She noted, "I am not sure he's having the mood swings and am concerned about [suicidal ideation] [and] previous [medications]." (*Id.*).

On March 7, 2011, Plaintiff reported to Dr. Fraum, "I've been lying to you x few months." (R. at 542). Plaintiff was paranoid, irritable and depressed, and his affect was anxious, blunted and restricted. (*Id.*). Additionally, Dr. Fraum noted he had visual hallucinations (e.g., shadows), paranoia and ideas of reference.[13] (*Id.*). Plaintiff reported compliance with his medications. (*Id.*). He was diagnosed with mood disorder and was prescribed Zoloft[14] and Abilify.[15] (*Id.*).

On April 28, 2011, Dr. Fraum determined Plaintiff's bipolar disorder results in both depressive and manic syndromes. (R. at 574). Plaintiff's generalized persistent anxiety is accompanied by motor tension, automatic hyperactivity and apprehensive expectation. (*Id.* at 575). Dr. Fraum opined Plaintiff had marked restriction of activities of daily living, marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace. (*Id.*).

On April 28, 2011, Plaintiff's mood was fair, and his affect was restricted and suspicious. (R. at 578). Dr. Fraum completed a bipolar residual functional capacity

---

[13] Ideas of reference are delusions "where one interprets innocuous events as highly personally significant." <http://psychcentral.com/encyclopedia/2008/ideas-of-reference/>

[14] Zoloft (Sertraline) increases serotonin in the brain, and can be used to treat depression, panic disorder, and social anxiety disorder, among other impairments. <http://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940>

[15] Abilify (Aripiprazole) "is used to treat nervous, emotional, and mental conditions (e.g., schizophrenia)," and can also be used to treat bipolar disorder and major depressive disorder. <http://www.mayoclinic.org/drugs-supplements>

questionnaire. (*Id.* at 576). She indicated Plaintiff becomes overwhelmed and irritable around other people, is unable to maintain socially appropriate behavior, responds to stress with frustration, has unstable relationships and has increased anxiety when he lacks control. (*Id.*). His illness has impacted his ability to sustain concentration and attention, and he responds to stress with anger and impulsive behavior. (*Id.*). Dr. Fraum opined that Plaintiff's symptoms would affect him in a work setting because he lacks the ability to manage his anger, lacks social skills, has low tolerance, is easily overwhelmed, has paranoid ideations, is impulsive and has poor judgment. (*Id.* at 577). Dr. Fraum concluded that Plaintiff would be unable to function in a competitive full-time work setting, and would probably miss work more than three times a month due to impairments and treatment. (*Id.*). Moreover, Dr. Fraum noted that "despite medication," Plaintiff continues to experience paranoia, irritability, mood swings, and poor impulse control. (*Id.*).

During his June 9, 2011 appointment, Plaintiff reported feeling more agitated and aggressive, and almost hitting someone. (R. at 581). Plaintiff also reported that he was told he had been talking to people who were not there. (*Id.*). His mood was neutral, and his affect was blunted. (*Id.*) Dr. Fraum stopped his Abilify and Zoloft and prescribed Invega.[16] (*Id.*). On June 23, 2011, Plaintiff reported feeling well and sleeping well, and that the medication was working. (*Id.* at 580). Plaintiff's mood and affect were subdued. (*Id.*). On July 25, 2011, Dr. Fraum indicated Plaintiff was staying calm, his mood was neutral, and his affect was blunted. (*Id.*). Still, about a

---

[16] Invega (Paliperidone) "is used to treat the symptoms of psychotic disorders, such as schizophrenia." <http://www.mayoclinic.org/drugs-supplements>

month later on August 29, 2011, he reported hearing weird sounds and having paranoid feelings. (*Id.* at 579). Plaintiff's mood was low and his affect was blunted and restricted. (*Id.*). Dr. Fraum added an anti-depressant, Celexa.[17] (*Id.* at 579, 620). On December 5, 2011, Plaintiff again reported weird sounds and mild paranoia. (*Id.* at 651).

## E. Treating Licensed Clinical Social Worker Daniel Martin

Dr. Fraum referred Plaintiff to therapy with Daniel Martin, LCSW.[18] (R. at 546). At his first therapy session on June 28, 2010, Plaintiff reported he was unable to work due to interpersonal problems. (*Id.* at 650). He reported a variety of symptoms, including psychosis, anxiety, and depressive, manic, and behavioral issues. (*Id.* at 547). Plaintiff's symptoms of depression had interfered with his hygiene. (*Id.* at 549). Martin recorded Plaintiff's history of refusing mediations and his episodic, heavy alcohol/drug use. (*Id.* at 551). Martin also noted Plaintiff's two previous outpatient addiction treatments in 2006 and 2009. (*Id.* at 552).

Upon mental status evaluation, Plaintiff was unable to pay attention, was easily distracted, had a recently and remotely impaired memory, had a guarded and suspicious attitude, a labile affect, and a thought content of worthlessness and hopelessness. (R. at 555). Martin noted Plaintiff having visual and auditory hallucina-

---

[17] Celexa (Citalopram) increases serotonin in the brain and is used to treat depression. <http://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/description/drg-20062980>

[18] Dr. Fraum and Social Worker Martin work in the same office within the Lake County Health Department and Community Health Center Behavioral Health Services. (R. at 485, 546).

tions, as well as a history of delusions of persecution. (*Id.*). Martin diagnosed Plaintiff with bipolar 1 disorder, mixed moderate, generalized anxiety disorder, intermittent explosive disorder, cannabis dependence and alcohol abuse. (*Id.* at 557). Martin concluded that Plaintiff's symptoms of mood disorder limited his functioning, and assessed his GAF score at 48. (*Id.*).

During his July 19, 2010 appointment, Plaintiff reported increased stability on his current medications, but also reported depression and anxiety. (R. at 649). During his October 20, 2010 appointment, Plaintiff continued to report compliance with his medication, and also discussed various legal problems he was facing. (*Id.* at 647). On December 2, 2010, Plaintiff's parole officer reported to Martin that Plaintiff had recent suicidal ideation. (*Id.* at 645). Martin telephoned Plaintiff who denied any suicidal thoughts and was concerned his thoughts of suicide may have been a side effect of his medication. (*Id.*). Plaintiff thus discontinued his medication.

On January 5, 2011, for the third time in a row, Plaintiff failed to show for his scheduled therapy.[19] (R. at 642). On January 18, 2011, Plaintiff reported that his medication side effects included vague suicidal thoughts. (*Id.* at 545). Martin diagnosed him with bipolar 1 disorder, mixed, moderate, generalized anxiety disorder, and intermittent explosive disorder, and assessed his GAF score at 46. (*Id.* at 565).

During his January 20, 2011 appointment, Plaintiff's memory and concentration were impaired, and he reported difficulty adapting to changes. (R. at 641). Martin

---

[19] Plaintiff was not seen for his scheduled May 19, 2011 session with Martin, after leaving the office before it started. (R. at 636). Plaintiff also failed to attend his July 7, 2011 and July 28, 2011 appointments, but called later to reschedule. (*Id.* at 634, 632).

noted Plaintiff was taking care of his children while his girlfriend worked. (*Id.*). On February 9, 2011, Martin recommended an anger management group. (*Id.* at 640). One month later, Plaintiff was having difficulty coping with life stressors. (*Id.* at 639). He reported feeling worthless and experiencing angry outbursts more frequently. (*Id.*). Martin discussed crisis care options. (*Id.*). On March 30, 2011, Plaintiff reported side effects of taking Abilify, including irritability and being more prone to angry outbursts. (*Id.* at 638).

On March 30, 2011, Martin completed a Report by Therapist. (R. at 572–73). Martin noted that Plaintiff is anxious and irritable around others, can become overwhelmed and respond with anger, has difficulty trusting others and becomes paranoid. (*Id.* at 572). Martin found that "unfortunately symptoms persist despite medication management and therapy." (*Id.* at 573). He diagnosed Plaintiff with bipolar 1 disorder, generalized anxiety disorder, and intermittent explosive disorder. (*Id.* at 572). Martin opined that Plaintiff's illness markedly restricts his daily activities, in that he isolates himself, is unable to focus, is unable to retain information, has negative thoughts, ruminates on violence and obsesses about hurting others. (*Id.*). Martin also concluded that Plaintiff's illness markedly impacts his ability to sustain concentration and attention, and results in frequent failure to complete tasks. (*Id.* at 573). Moreover, Martin explained that Plaintiff's anxiety keeps him from staying focused, and when he is unable to complete a task, he abandons it. (*Id.*). Martin thus concluded that Plaintiff cannot function competitively in a full-time work setting. (*Id.*).

At his April 21, 2011 appointment, Martin worked with Plaintiff on coping strategies, mood stability, and emotional regulation. (R. at 637). Plaintiff reported angry outbursts were less frequent. (*Id.*). On July 7, 2011, Martin assessed his GAF score at 44. (*Id.* at 607). On August 17, 2011, Plaintiff reported his mood was more stable, and his medication compliance had improved. (*Id.* at 631). Less than one month later, on September 8, 2011, Plaintiff reported he was court ordered to attend a domestic violence group, which he was doing. (*Id.* at 630). On October 13, 2011, Plaintiff was doing well attending the domestic violence class, was getting along with his mother and girlfriend, and was watching his two children while his girlfriend worked. (*Id.* at 629). Plaintiff's mood was stable, but his major stressor was lack of income. (*Id.*). On October 27, 2011, Martin indicated Plaintiff still needed therapy. (*Id.* at 585).

On November 3, 2011, Martin concluded that Plaintiff's illness continued to markedly restrict his daily activities, socialization, and ability to sustain concentration and attention. (R. at 622–23). Later in the report, Martin indicated Plaintiff had *extreme* limitations in maintaining social functioning. (*Id.* at 624). Martin opined that Plaintiff could not function in a competitive, full-time work setting. (*Id.* at 623). While Plaintiff's medication compliance had improved, Martin noted that "treatment has not resulted in a remission of symptoms." (*Id.*).

On November 10, 2011, Plaintiff reported he was depressed about financial problems. (R. at 628). On December 8, 2011, Martin found that Plaintiff continued to struggle with symptoms of depression, mood swings and irritability. (*Id.* at 626).

## F. Function Reports

In a function report dated July 16, 2010, Plaintiff's mother, Tera Malott, indicated that Plaintiff lived with her, his girlfriend and his two children. (R. at 321). Plaintiff cared for his children, but Plaintiff's girlfriend and Ms. Malott helped him. (*Id.* at 322). In a function report dated August 3, 2010, Plaintiff wrote that his girlfriend and his mother help him care for the children. (R. at 334).

## G. Lake County Jail Assessments

During an intake mental health assessment on August 18, 2010, Plaintiff's orientation was alert, his affect, speech and behavior were appropriate, his thought process was logical, his mood was depressed (R. 521), and he was crying (*id.* at 523). He did not want medication. (*Id.* at 521). The evaluator recorded bipolar disorder with paranoia. (*Id.*). Approximately one week later, during an August 24, 2010 assessment, Plaintiff indicated depression, racing thoughts, and paranoia "due to being in jail." (*Id.* at 520). In a September 3, 2010 mental health evaluation, Plaintiff was alert and oriented, had appropriate speech, mood, affect and behavior and had logical thought process. (*Id.* at 518).

## H. DDS Reports

DDS consultant, Phyllis Brister, PhD., completed a psychiatric review technique on September 7, 2010. (R. at 497). She diagnosed bipolar disorder, but found that it did not satisfy the diagnostic criteria of listing 12.04. (*Id.* at 500). Plaintiff has behavioral changes or physical changes associated with regular substance use that affect the central nervous system. (*Id.* at 505). Furthermore, Plaintiff has moderate

limitations in maintaining social functioning and maintaining concentration, persistence or pace. (*Id.* at 507). Regarding credibility issues, Dr. Brister reported there were "no gross inconsistencies." (*Id.* at 509). In a mental residual functional capacity assessment, Plaintiff functions in the borderline range of intelligence, but Dr. Brister concluded he is capable of simple substantial gainful activity. (*Id.* at 511–13). Dr. Brister opined that Plaintiff is moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or proximity to others without being distracted by them. (*Id.* at 511). Dr. Brister opined that Plaintiff's intelligence limits him to simple, 1–2 step, repetitive operations. (*Id.* at 513). Moreover, he would do best in a socially undemanding and restricted setting, although he could adapt to routine changes. (*Id.* at 513). On December 16, 2010, nonexamining DDS consultant Kirk Boyenga, Ph.D., affirmed Dr. Brister's findings. (R. 538–40).

## I. Hearing

At the hearing, Plaintiff testified he had academic and behavioral problems throughout his time in school. (R. at 32, 33). He further testified that he has concentration difficulties (*id.* at 32), temper problems, difficulty controlling how he reacts when he disagrees with others (*id.* at 38), memory problems and depression (*id.* at 51–53). He stated he has paranoid feelings, which is partly why he does not go out alone. (*Id.* at 49). Plaintiff testified he could not hold a job because he takes a long time to perform tasks, and he makes mistakes. (*Id.* 37). He further testified that he

always has had help taking care of his children. (*Id.* at 39). Plaintiff noted that previous medications caused side effects of suicidal thoughts (*id.* at 48), and current medications cause side effects of drowsiness (*id.* at 42–43, 47).

## V. DISCUSSION

Plaintiff raises three arguments in support of his request to reverse or remand: (1) "the ALJ's analysis of the treating psychiatrist's opinion was flawed"; (2) the ALJ's credibility finding was "insufficient"; and (3) the ALJ's "overreliance" on the consulting psychiatrist's pre-sentencing report demonstrates that the decision is not supported by substantial evidence. Because arguments (1) and (3) concern a similar issue, they will be discussed together first, followed by discussion of Plaintiff's second argument.

### A. Weight Given to Medical Sources

Plaintiff contends that the ALJ improperly gave limited weight to Dr. Fraum's opinion. (Mot. 8–10). He argues that the frequency of Plaintiff's visits with Dr. Fraum, in addition to the fact that Dr. Fraum is a treating source, dictate that more weight be given to her opinion. (*Id.*). Plaintiff further argues that Dr. Fraum's opinion was based on her clinical findings and observations of Plaintiff, not only Plaintiff's subjective self-reports. (*Id.*). Plaintiff thus asserts that the ALJ failed to provide good reasons that were sufficiently specific for assigning minimal weight to Dr. Fraum's opinion. (*Id.*).

By rule, "the opinion of a treating doctor generally is entitled to controlling weight if it is consistent with the record, and in any event it cannot be rejected

without a "sound explanation." *Sambrooks v. Colvin*, 566 F. App'x 506, 510 (7th Cir. 2014) (quoting *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011)). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). An ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In evaluating the weight to give an examining physician's opinion, the ALJ must consider relevant medical evidence, the consistency of the opinion with the record as a whole, the physician's specialty, if any, and other factors which support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)–(6), 416.927(c)(3)–(6).

It is against this legal landscape that the Court reviews the ALJ's decision to give Dr. Fraum's opinion "minimal weight." The entirety of the ALJ's discussion of Dr. Fraum's opinion is:

> [because] the undersigned cannot regard [Plaintiff] as a reliable witness. . . . Therefore, the undersigned also is assigning minimal weight to Dr. Fraum's April 2011 functional assessment, which simply mirrored that provided by therapist Dan Martin, LCSW, and is heavily-dependent upon the accuracy of subjective claimant self-report.

(R. 17) (citations omitted).

The Court is troubled by this finding, as the ALJ's brevity makes it difficult to determine how the ALJ reached his conclusion. In the most generous reading, the Court has deciphered three reasons for the ALJ's assignment of "minimal weight" to Dr. Fraum's opinion: (1) Plaintiff lied to Dr. Fraum; (2) Dr. Fraum's report mirrored Martin's report; and (3) Dr. Fraum's report was dependent on Plaintiff's self-reports.

First, the ALJ fails to explain how Plaintiff's lie to Dr. Fraum during the March 7, 2011 visit influenced the weight he gave to Dr. Fraum's assessment. (R. at 17). The treatment note at issue, in which Dr. Fraum writes, "I've been lying to you x few months," does not indicate what the actual lie was. (*Id.* at 542). The Commissioner cannot seem to find it in the record; nor can the Court. While lying to one's doctor may be significant in terms of Plaintiff's credibility, it is notable that Plaintiff admitted lying to Dr. Fraum. So Dr. Fraum was aware of the lie and, taking that into account, rendered the opinion she thought medically appropriate. That Plaintiff lied to Dr. Fraum on one occasion, and admitted it, is simply insufficient to give minimal weight to the treating psychiatrist's opinion. *See Ryan v. Comm'r*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations."). More fundamentally, the ALJ fails to explain how this fact contributed to his assignment of weight.

Second, the ALJ's statement that Dr. Fraum's assessment mirrored LCSW Martin's assessment is conclusory and unconnected to any discussion about weight. (R. at 17). Indeed, Dr. Fraum found that Plaintiff is overwhelmed and irritable around others, is unable to maintain socially appropriate behavior, responds to stress with frustration, and has increased anxiety when lacking control of a situation. (*Id.* at 576). She diagnosed bipolar disorder, impulse control disorder, alcohol dependence and marijuana dependence. (*Id.*). Similarly, Martin found that Plaintiff becomes anxious and irritable around others, becomes overwhelmed and responds with anger when in a group, has difficulty trusting others, avoids new situations and becomes overwhelmed when there are changes. (*Id.* at 572). He diagnosed bipolar disorder, generalized anxiety disorder and intermittent explosive disorder. (*Id.* at 572). But the ALJ's opinion does not provide the Court any clue as to why a similar opinion from Plaintiff's social worker does not support and strengthen, as opposed to weaken, Dr. Fraum's assessment.

The ALJ goes on in the next paragraph to give little weight to Martin's observations because, pursuant to Social Security Ruling (SSR) 06-03p,[20] social workers are not medically-acceptable sources. (R. at 17). Perhaps this is the basis for the ALJ's criticism of Dr. Fraum's opinion to the extent it "mirrors" LCSW Martin's. However,

---

[20] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

while the opinions of social workers "cannot establish the existence of a medically determinable impairment," information from social workers "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03. SSR 06-03 further explains:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Thus, while Martin's opinions need not be given controlling weight, they must, at a minimum, be evaluated.[21] Moreover, SSR 06-03 is not a basis to give Dr. Fraum's medical opinion minimal weight simply because she reaches the same conclusion regarding Plaintiff that the LCSW assigned to his case reached.

Third, the ALJ erred in failing to explain how Plaintiff's subjective self-reports affected the weight he gave to Dr. Fraum's opinion. The ALJ noted that Dr. Fraum's assessment "is heavily-dependent upon the accuracy of . . . [Plaintiff's] self-report." (R. at 17). However, Dr. Fraum's opinions were not based solely on Plaintiff's self-reports. If a "physician's opinion is . . . based *solely* on the patient's subjective com-

---

[21] Plaintiff did not explicitly appeal the ALJ's evaluation of Martin's opinions. (*But see* Mot. 12) ("Dr. Fraum's psychiatric notes, along with the notes of Social Worker Martin, constitute the biggest source of information about Plaintiff's ongoing functioning from the initial psychiatric assessment of March 22, 2010, through December 5, 2011) (citations omitted). Nevertheless, on remand, the ALJ should properly evaluate Martin's treatment notes and opinions.

plaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added). Dr. Fraum's opinion that Plaintiff would be unable to function in a competitive work setting (*id.* at 577) was not a mere recitation of Plaintiff's self-report, but was also based on her observations and almost two years of treatment of Plaintiff. (*See, e.g.,* R. at 487 (observed slow processing and responses), 484 (noted racing thoughts), 531 (noted low mood and restricted affect), 578 (noted suspicious affect), 488, 483, 579, 581 (adjusted Plaintiff's medication)).

Plaintiff's self-reports were necessarily factored into Dr. Fraum's analysis, as almost all diagnoses require some consideration of the claimant's subjective symptoms. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012) ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."). The ALJ failed to identify any evidence in the record to suggest that Dr. Fraum relied unnecessarily on Plaintiff's description of his symptoms in addition to her own observations, in concluding that Plaintiff was incapable of full-time work. *See Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *19 (N.D. Ill. March 21, 2012) ("The ALJ fails to point to anything that suggests that the weight [the claimant's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable.").

Dr. Fraum treated Plaintiff for almost two years, from March 22, 2010, to December 5, 2011. (R. at 485, 651). Prior to Dr. Fraum's April 28, 2011 report, in

which she opined that Plaintiff would be unable to function in a competitive full-time work setting, Dr. Fraum saw Plaintiff seven times. (*Id.* at 577, 484, 483, 531, 543, 542). Dr. Fraum also saw Plaintiff on April 28, 2011, the day she rendered her report. (*Id.* at 578).

Dr. Fraum's opinions are consistent with the record and supported by the evidence. In her April 28, 2011 report, Dr. Fraum diagnosed Plaintiff with bipolar disorder NOS, impulse control disorder, alcohol dependence and marijuana dependence[22] (*id.* at 576), diagnoses that are continuously noted throughout the record (*see, e.g., id.* at 487, 262, 484, 557, 569, 500, 565, 572). Additionally, Dr. Fraum opined that Plaintiff's illness impacts his ability to sustain concentration and attention, which results in frequent failure to complete tasks. (*Id.*). To support this conclusion, Dr. Fraum explained that Plaintiff is "unable to maintain attention for more than short periods" (*id.*), an observation that was repeatedly noted throughout the record (*see, e.g., id.* at 488 (Dr. Fraum identifies attention deficit problems), 388 (a 2005 report notes Plaintiff's hyperactivity and difficulty sustaining attention), 555 (mental status evaluation reveals inability to pay attention and easy distractibility); *but see id.* at 461, 468 (Dr. Latham notes attention and concentration "relatively unimpaired," yet also diagnoses Plaintiff with ADHD)). Furthermore, Dr. Fraum's opinion that Plaintiff would be off-task for more than 15% of the workday is supported

---

[22] Although Dr. Fraum did not indicate that the alcohol and marijuana dependence were in remission, it is noted elsewhere throughout the record. (*See, e.g.,* R. at 487, 262). The ALJ also found that Plaintiff's substance abuse was in remission (*id.* at 13), and the question of whether substance abuse predicated Plaintiff's impairments is not presently at issue.

by Plaintiff's symptoms of paranoia, irritability, mood swings, and poor impulse control (*id.* at 577), which are, again, noted throughout the record. For example, during Dr. Latham's evaluation, Plaintiff's answers on the Millon Clinical Multiaxial Inventory-III revealed "prominent schizoid personality features and significant avoidant, paranoid and dependent personality traits." (*Id.* at 462). Plaintiff's mood has been variously described as dysphoric (*id.* at 490), depressed (*id.* at 487, 559, 521), blunted (*id.* at 484), and neutral (*id.* at 484, 542); Dr. Fraum diagnosed Plaintiff with a mood disorder on March 7, 2011 (*id.* at 542). Furthermore, Dr. Latham and LCSW Martin both agree that Plaintiff has poor impulse control. (*See, e.g.*, 461, 546, 649). Indeed, Martin frequently worked with Plaintiff on mood stability, impulse control and emotional regulation during therapy sessions. (*See, e.g.*, *id.* at 637, 649, 630). Given the above, Dr. Fraum's conclusion that Plaintiff would be unable to function in a competitive full-time work setting (*id.* at 577) may be entitled to controlling weight.

Finally, the Commissioner argues that Dr. Fraum's conclusions could be "reasonably questioned" because (1) "Plaintiff admitted that he lied and manipulated his mental health treatment sources to get his desired result"; (2) Plaintiff had inconsistent medication compliance; and (3) Dr. Fraum's objective findings do not support the diagnoses and symptoms that Dr. Fraum cites "as the basis for justifying marked or extreme limits in mental functioning." (Resp. 5–7). But the ALJ did not rely on these reasons in his decision, and the Court must limit its review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943);

*accord Hanson v. Colvin*, —F.3d—, No. 13-3473, 2014 WL 3732910, at *3 (7th Cir. July 30, 2014) ("We are particularly concerned about the *Chenery* violations committed by the government because it is a recurrent feature of the government's defense of denials of social security disability benefits, as this court has noted repeatedly.").

In any event, the Commissioner's contentions are not accurate. First, while Plaintiff feigned a fit in order to get out of a treatment program (R. at 5), Plaintiff then went on to complete treatment at another location (*id.* at 463). Second, as to medication noncompliance, the Commissioner suggests that Plaintiff was selling his prescription medication while he was being treated by Dr. Fraum and Martin, (Resp. 6), but there is no evidence of this. Rather, on February 8, 2010, Plaintiff had his court-ordered initial contact in connection with the charge for selling his prescription Adderall (R. at 489). He began treatment with Dr. Fraum on March 22, 2010 (*id.* at 485), and with Martin on June 28, 2010 (*id.* at 650). In addition, Plaintiff's treatment record is replete with references to his medication management, difficulties with medication compliance, and complaints about side effects. (*See e.g.,* R. at 484, 650, 551, 556, 645). On February 14, 2011, Plaintiff even reported to Dr. Fraum that he stopped his medications two months earlier due to side effects. (*Id.* at 543). Thus, contrary to the Commissioner's assertions, Dr. Fraum and LCSW Martin were certainly aware of Plaintiff's issues with medication compliance, and would have taken those issues into account in rendering their opinions. Lastly, Dr. Fraum's findings support her opinion that Plaintiff had marked and extreme limits

in mental functioning. By the time of her April 28, 2011 assessment, Dr. Fraum had been treating Plaintiff for over one year. (*Id.* at 576). She took her own notes and presumably also relied on Martin's notes in coming to her conclusions. The treatment notes variously indicate Plaintiff's slow responses, very slow processing speed (*id.* at 487), blunted affect, racing thoughts (*id.* at 484), difficulty paying attention, easy distractibility (*id* at 556), and memory impairment (*id.* at 641), among other findings. The Commissioner's claim that Dr. Fraum's objective findings do not support her opinions is simply unsupported.

If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider a checklist of factors—"the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion"—to determine what weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527. Here, the ALJ failed to address the checklist of factors in any way. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play).

Applying these factors to Dr. Fraum, it is difficult to understand why her opinion should not be given significant weight. She treated Plaintiff monthly for almost two years, psychiatry is her area of expertise, and her opinion is well-supported by the treatment record, including the treatment provided by the LCSW assigned to Plain-

tiff's case, and is not inconsistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(d)(2). On remand, the ALJ shall reevaluate the weight to be afforded to Dr. Fraum's opinion. If the ALJ has any concerns about giving great weight to Dr. Fraum's opinion, he shall contact Dr. Fraum, order a consultative examination, or seek the assistance of a medical expert. *See* SSR 96–5p, at *2; 20 C.F.R. §§ 404.1517, 416.917, 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("If the ALJ thought he needed to know the basis of medical opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.") (citation omitted). If the ALJ finds "good reasons" for not giving Dr. Fraum's opinions controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Fraum's opinion.

Furthermore, the ALJ's decision to afford the "greatest weight" to Dr. Latham's presentencing evaluation is not supported by substantial evidence. Dr. Latham is a nontreating physician whose June 19, 2009 report was based on a single visit. (R. at 460). Thus, his conclusions do not take into account the voluminous treatment records from 2010 and 2011 that followed. Additionally, the ALJ's conclusion about Dr. Latham's report misstates the record. The ALJ stated that Dr. Latham "thought that vocational success and medication management would help reduce antisocial

conduct, which *correspondingly implies that he regarded* [*Plaintiff*] *as capable of working*." (*Id.* at 18) (emphasis added). Dr. Latham prepared a report to assist a sentencing judge to impose a sentence, he did not opine on Plaintiff's ability to work. Moreover, Dr. Latham diagnosed Plaintiff with a variety of impairments, including ADHD and anxiety disorder. (*Id.* at 468–69). Dr. Latham's statement, "vocational success may help reduce Mr. Malott's antisocial conduct" (*id.* at 468), does not equate to an opinion that Plaintiff is capable of working. There is no basis in the record to find Dr. Latham's presentence report supports Plaintiff's ability to work.

## B. Plaintiff's Credibility

Plaintiff contends that the ALJ erred in his credibility analysis because the ALJ ignored Plaintiff's testimony about taking care of his children, and because the ALJ ignored treatment notes from treating sources that support Plaintiff's claim of disability. (R. at 10–13).

In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); see 20 C.F.R. § 404.1529(c); SSR 96-7p. Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473

F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

Here, it is not at all clear what the ALJ's credibility determination is. The ALJ merely summarizes some of the evidence before stating, "in this regard, the undersigned cannot regard claimant as a reliable witness." (R. at 17). In what regard?

In the paragraph immediately prior to this statement, the ALJ discusses Plaintiff's financial stress—specifically, that Plaintiff needed "disability benefits to make ends meet," that he "contemplated returning to illegal activity," and that he had felony arrests involving selling his prescription medications. (R. at 17). The ALJ elsewhere discusses Plaintiff's felony convictions, tattoos, and "likelihood of gang involvement." (R. at 16–17). But it is unclear if the ALJ used this evidence to support his finding that Plaintiff is not "reliable." (*Id.* at 17).

Although some evidence seems to support the ALJ's conclusion about Plaintiff's credibility, we remand the issue for further consideration because the ALJ did not sufficiently explain his analysis. The Commissioner is correct that an ALJ's credibility determination should be upheld as long as it is not "patently wrong." (R. at 10) (citing *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)). Here, it is not as much patently wrong as it is patently unclear. The ALJ's decision "must provide enough discussion for us to afford [the plaintiff] meaningful judicial review and assess the validity of the agency's ultimate conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856–57 (7th Cir. 2014) (citing *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014)). "An ALJ

must comply with the requirements of Social Security Ruling 96-7p." *Brindisi ex rel.*

*Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

Pursuant to SSR 96-7p:

> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The ALJ failed to articulate sufficiently "specific reasons." *Id.* For example, while the ALJ noted there was a degree of validity to Plaintiff's statements about being slow, forgetful, and having a temper, he failed to make clear "the weight [he] gave to [Plaintiff's] statements and the reasons for that weight." *Id.*

The Commissioner attempts to explain the credibility analysis for the Court. For instance, the Commissioner maintains that the ALJ's RFC determination was "based in part on giving some credit to [Plaintiff's] symptoms." (Resp. at 7). The Commissioner further argues, "the ALJ considered the mental evaluation findings from a school psychologist." (*Id.* at 8). Finally, the Commissioner asserts that the ALJ considered Plaintiff's lies to his doctors, how he took care of his children, and his prior felony convictions in making the credibility determination. (*Id.* at 9–10). While the ALJ does discuss much of the above, it is simply unconnected to any discussion regarding Plaintiff's credibility. Again, the Court must limit its review to

the rationale offered by the ALJ. *See Chenery Corp.,* 318 U.S. 80 at 90. And in the credibility analysis, that rationale must be "sufficiently specific." SSR 96-7p.

On remand, the ALJ shall reevaluate Plaintiff's credibility with due regard for the full range of medical evidence and Plaintiff's statements. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). If the ALJ finds good reasons for not considering this evidence, the ALJ shall provide explicit reasons for his decision not to do so. The ALJ shall also articulate specific reasons for his credibility finding, including the weight he gives to Plaintiff's statements "and the reasons for that weight." SSR 96-76p.

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). On remand, the ALJ shall reassess Plaintiff's credibility and reevaluate the weight to be afforded Dr. Fraum's opinion. The ALJ shall properly evaluate LCSW Martin's opinion in accordance with SSR 06-03. The ALJ shall then reevaluate Plaintiff's RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [11] is **GRANTED**, and Defendant's Motion for Summary Judgment [16] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and

the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: September 12, 2014

Mary M Rowland

_____
MARY M. ROWLAND
United States Magistrate Judge